# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**BUILDERS BANK,**

      Plaintiff,

-vs-

**WARBURTON RIVER VIEW CONDO LLC,**
And **JOSE ESPINAL,**

      Defendants.

**09 CIV. 5484**

Case No.

**JUDGE KARAS**



## COMPLAINT FOR FORECLOSURE

### Nature of the Action

1.    Plaintiff, **Builders Bank** ("Builders"), brings this civil action to foreclose on certain properties in the City of Yonkers, New York.

### Jurisdiction

2.    Jurisdiction of this Court is provided for by 28 U.S.C. § 1332(a)(1), which gives United States District Courts original jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000.00. Here, the citizenship of Plaintiff (Illinois) and Defendants (New

York) is completely diverse.  Plaintiff seeks more than $75,000.00, in that it seeks a judgment for amounts due from Defendants in excess of $4,300,000.00.

## Venue

3.   Venue is proper in the Southern District of New York under Section 1391(a) which provides that where jurisdiction is founded only on diversity, a civil action may be brought in a judicial district where any defendant resides if all defendants reside in the same state or a judicial district in which…a substantial part of property that is the subject of the action is situated.  As more fully described below, all Defendant parties are citizens of New York and the property which is the subject of this action lies within the Southern District of New York.

## Plaintiff

4.   Plaintiff, Builders Bank, is an Illinois Banking Corporation with principal offices in Chicago, Illinois.

## Defendants

5.  Defendant Warburton River View Condo LLC is a New York Limited Liability Company.  Its sole member is Jose Espinal.  Jose Espinal is a resident of Rye Brook, New York.

## Cause of Action

## Count I

6.   On May 17, 2007, Warburton River View Condo LLC borrowed from Plaintiff the sum of $3,375,000.00 and executed a Note and Mortgage memorializing the transaction. (See Exhibits A and B, attached).

7.   The Note was to be paid in monthly installments with interest calculated at the higher of 8.00% per annum or 1.00% in excess of the Prime Rate of interest announced by Bank of America, N.A. from time to time.   Default interest was fixed at 5.00% above the Loan rate, and late charges at 5 cents on the dollar of any payment overdue in excess of five days.

8.   The maturity date of the Note was originally fixed as November 5, 2008, but was extended by virtue of a Consolidation and Modification Agreement, (See Exhibit C), to November 5, 2009.

9.   The legal description of the subject land commonly known as 1175, 1179 and 1189 Warburton Avenue, Yonkers, New York, is as follows:

PARCEL I:

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of Yonkers, County of Westchester and State of New York, known as 1189 Warburton Avenue, and designated on a certain map entitled "Map of Pinecrest on Hudson situated in the City of Yonkers and Village of Hastings, Westchester County, N.Y.," dated October 1907, and made by Ward Carpenter & Sons, C.E. and S., Tarrytown, N.Y. and filed in the Office of the Clerk of the County Westchester, Division of Land Records on December 16, 1907, as all of Plot

No. 22 and the southerly 20 feet of Plot No. 23 and more particularly bounded and described according to said map as follows:

BEGINNING at a point on the westerly side of Warburton Avenue distant southerly 165.34 feet from the corner formed by the intersection of the westerly side of Warburton Avenue with the southerly line of a Right of Way;

RUNNING THENCE North 70 degrees 29 minutes 50 seconds West 201.87 feet per deed and 201.25 feet per actual measurement to easterly property line of the New York Central Railroad Company;

THENCE southerly along said Railroad's land South 24 degrees 02 minutes 30 seconds West 80.26 feet per deed and South 23 degrees 59 minutes 12 seconds east 80.24 feet per actual measurement to the southwest corner of said Plot No. 22;

THENCE easterly on a course South 70 degrees 29 minutes 50 seconds East along the southerly line of said Plot No. 232.20 feet to the westerly side of Warburton Avenue;

THENCE northerly on the westerly side of Warburton Avenue, on a curve to the left having a radius of 465.70 feet an interior angle of 21 degrees 14 minutes 45 seconds, a distance of 81.15 feet to the point and place of BEGINNING,

PARCEL II:

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of Yonkers, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Warburton Avenue at the southerly line of land formerly of Patrick J. Keary, formerly known on the Assessor's Map of the City of Yonkers by the number 1183, said point of beginning monumented by a stone monument; and

RUNNING THENCE along the southerly line of said land North 70 degrees 29 minutes 50 seconds West 231.08 feet per deed and 230.52 feet per actual measurement to a point distant 1 foot easterly from the easterly line of land of the New York Central and Hudson River Railroad Co.;

THENCE parallel to said easterly line of said land of the New York Central and Hudson River Railroad Co. and always 1 foot easterly therefrom, South 24 degrees 02 minutes 30 seconds West 50.16 feet per deed and 50.12 feet per actual measurement to a line drawn parallel to said southerly line of said land formerly of Keary and always distant 50 feet southerly therefrom measured at right angles thereto and a prolongation of said parallel line;

THENCE South 70 degrees 29 minutes 50 seconds East along said parallel line and prolongation thereof, 242.46 feet per deed and 241.87 feet per actual measurement to the westerly line of Warburton Avenue; and

THENCE northerly along the westerly line of Warburton Avenue along a curve bearing to the left having a radius if 465.70 feet an interior angle of 21 degrees 14 minutes 45 seconds a distance of 50.54 feet to the point and place of BEGINNING.

PARCEL III:

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of Yonkers, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Warburton Avenue at the southerly line of the premises conveyed by H. Reed Hawley and his wife to Mary E. Deane by deed dated December 2, 1913, said point of beginning being distant measured along the said westerly side of Warburton Avenue 50.54 feet from the southerly line to land now or formerly of Patrick J. Keary;

RUNNING THENCE westerly along the said southerly line of the land so conveyed to said Mary E. Deane North 70 degrees 29 minutes 50 seconds West 242.46 feet per deed and 241.87 feet per actual measurement to a point distant 1 foot easterly line of the land of the New York Central and Hudson River Railroad Company;

THENCE southerly parallel with the easterly line of the land of the New York Central Railroad Company and always distant 1 foot easterly therefrom North 23 degrees 59 minutes 12 seconds East 24.34 feet per deed and 23.52 feet per actual measurement to an angle in said easterly line;

THENCE westerly still parallel with the said westerly line of the New York Central and Hudson River Railroad Company and always distant 1 foot therefrom North 66 degrees 00 minutes 48 seconds West 59 feet to an angle therein,

THENCE southerly still parallel with the said easterly line and 1 foot easterly therefrom South 23 degrees 59 minutes 12 seconds West 21.29 feet per deed and 22.17 per actual measurement to a point;

THENCE easterly along the division line between lands now or formerly of SMG Management Agency LLC and the premises herein described South 70 degrees 29 minutes 50 seconds East line 305 feet per deed and 306.27 feet per actual measurement to the westerly side of Warburton Avenue; and

THENCE northerly along the westerly side of Warburton Avenue along a curve to the left having a radius of 465.70 feet an interior angle of 21 degrees 14 minutes 45 seconds a distance of 41 feet to the point and place of BEGINNING.

10.   The mortgage was duly recorded in the office of the Westchester County Clerk on June 18, 2007, as Control No. 471630481, and the appropriate tax was paid.

11.   Subsequently, on November 7, 2007, Warburton River View Condo LLC borrowed from Plaintiff the sum of $1,100,000.00 and executed a Note and Mortgage memorializing the transaction. (See Exhibits D and E, attached).

12.   The Note was to be paid in monthly installments with interest calculated at the higher of 7.50% per annum or 1.00% in excess of the Prime Rate of interest announced by Bank of America, N.A. from time to time. Default

interest was set at 5.00% above the Loan rate, and late charges at 5 cents on the dollar of any payment overdue in excess of five days.

13. The maturity date of the Note was originally fixed as May 5, 2009, but by virtue of a Consolidated and Modification Agreement ("Modification Agreement") (see Exhibit C) was extended to November 5, 2009. Additionally, as a result of the Modification Agreement, the interest rate was changed to the higher of 8.00% per annum or 1.00% in excess of the Prime Rate.

14. The legal description of the subject land covered by the November 7, 2007, mortgage and commonly known as 1171 Warburton Avenue in Yonkers, New York is as follows:

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of Yonkers, County of Westchester and State of New York, bounded and described as follows:

BEGINNING at a point in the westerly side of Warburton Avenue at the southeasterly corner of premises heretofore conveyed by Mathew A. Broderick and his wife, to Kenneth Sylvan Guthrie, by deed dated October 15, 1921 and recorded in the Office of the Register of the County of Westchester, now the office of the Clerk of the County of Westchester, Division of Land Records, on October 26, 1921 in Liber 2335 of Deeds, at page 63, said point of beginning being distant measured southerly along the westerly side of Warburton Avenue 91.54 feet from a stone monument set in the ground at the southeasterly corner of land now or formerly belonging to Patrick J. Keary, said point of beginning also being distant measured southerly along the said westerly side of Warburton Avenue, 412.90 feet from the northerly line of the City of Yonkers, and

RUNNING THENCE westwardly along the southerly side of the said land heretofore conveyed to Guthrie, a distance of 305 feet to the northwesterly corner of the premises herein described, said corner is distant 1 foot easterly

from the easterly side of land now or formerly belonging to the New York Central and Hudson River Railroad Company;

RUNNING THENCE southwardly at an interior angle of 97 degrees 24 minutes 20 seconds to the last mentioned course and parallel with the said easterly side of said land now or formerly belonging to said New York Central and Hudson River Railroad Company;, and always distant 1 foot easterly therefrom, a distance of 50.42 feet to the southwesterly corner of the premises herein described;

RUNNING THENCE eastwardly at an interior angle of 82 degrees 25 minutes 40 seconds to the last mentioned course, a distance of 308.55 feet to a point in the westerly side of Warburton Avenue, and

RUNNING THENCE northwardly along said westerly side of Warburton Avenue, a distance of 50 feet to the point and place of BEGINNING.

15.   The mortgage was duly recorded in the Office of the Westchester County Clerk on February 12, 2008, and the appropriate tax was paid.

16.   Repayment of the sums due under both the May 17, 2007, Note and the November 7, 2007, Note were guaranteed personally by Defendant Jose Espinal. (See Exhibits E and F, attached).

17.   On December 29, 2008, Plaintiff Builders Bank and Defendant entered into a "Consolidation and Modification Agreement" ("Consolidation Agreement"). (See Exhibit C).  Under this Agreement, the parties agreed that the two Notes and Mortgages would be consolidated and considered as one Note and Mortgage.  (See Exhibit C, ¶ R, p. 6, and Schedule B), under which an unpaid principal balance of

4,225,000.00 was owed and secured by the mortgage in the original aggregate principal sum of $4,475,000.00.

18.   Also under the Consolidation Agreement, the parties agreed that in addition to the interest payments due on the outstanding principal balance, for each month commencing January 5, 2009 through October 5, 2009, Defendant would make payments of $50,000.00, to be applied in reduction of the principal balance. (See Exhibit C, ¶ A., pp. 2-3).

19.   Finally, the Consolidation Agreement extended the maturity date of the Note to November 5, 2009, and set the interest rate at the higher of 8.00% per annum plus 1.00% above the Prime Rate.

20.   On January 27, 2009, the Consolidation Agreement was duly registered in the office of the Clerk of Westchester County as Control No. 490210319, and the appropriate tax was paid.

21.   Defendant Jose Espinal also executed a reaffirmation of the continuing guaranties he had earlier signed covering the May 17, 2007 and November 7, 2007 Notes. (See Exhibit G, attached).

22.   The mortgage documents covering the subject property provide that:

If an Event of Default occurs, Lender may, at its option, declare the whole of the Indebtedness to be immediately due and payable without further notice to Borrower, with interest thereon accruing from the day of such Event of Default until paid at the Default Rate.

(See Exhibit B, p. 18, § 16(i); Exhibit E, p. 18, § 16(i))

23.   The Mortgage documents further provide that in case of a sale on foreclosure, the premises might be sold in one parcel.  See Exhibit B, p. 13, § 13(f); Exhibit E, p. 13, § 13(f).

24.   The mortgage further provided that the holder thereof in any action to foreclose it, should be entitled, without regard to the value of the premises, to the appointment of a receiver of the rents and profits of the mortgaged premises.  (See Exhibit B, p. 19, ¶ 19; Exhibit E, p. 19, ¶ 19).

25.   Plaintiff, Builders Bank, is still the owner and holder of the Note and Mortgage attached as Exhibits A, B, E and D.

26.   Defendant Warburton failed to make the payments due under the parties' agreements.   Specifically, Defendant failed to tender the May 5 and subsequent interest payments due under the parties' agreements.

27.   As was its right, Plaintiff accelerated the loan and demanded full payment from Defendant, who, despite the demand, has failed to pay and continues to fail to pay the full amount due under the parties' agreement.  (See Exhibit G).

28. There is now (as of June 11, 2009) due:

a)  Entire Principal Balance: $4,175,000.00
b)  Note Interest Rate:        $62,161.11
c)  Default Interest Rate:     $68,655.53

d) Late Charges:                $208,750.00

29.  During the pendency of this action, the Plaintiff may be compelled, in order to protect the mortgaged premises and the lien of the mortgages, to pay taxes, assessments, tax claims, water and sewer rates, fire insurance premiums, and other expenses of preservation of premises and the Mortgage, which Plaintiff demands be added to the amount due Plaintiff herein and be paid from the proceeds of sale of said mortgaged premises, together with interest thereon from time of such payment.

30.  Each and all of the Defendants have, or claim to have, some interest in or lien upon the mortgaged premises or some part thereof, which interest or lien, if any, is subject and subordinate to the lien of the notes and mortgages held by the Plaintiff.

31.  The Plaintiff shall not be deemed to have waived, altered, released, or changed the election to call the Mortgages for payment in full and to commence this action by reason of the payment after the date of the commencement of this action or after the calling of the mortgages for payment in full, of any or all of the defaults mentioned herein; and such election to call for the payment of the mortgages in full shall continue and remain until all amounts due under the notes and mortgages and all costs and disbursements are fully paid.

32.   No other action has been commenced at law, or otherwise, for the recovery of the sum, or any part thereof, secured by the notes and mortgages.

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

A.   The Defendants and all other persons claiming under them or any other person whose conveyance was made or whose interest was created subsequent to the filing of a notice of pendency of this action in the office of the Clerk of Westchester County, New York, be barred and foreclosed of all right, title, claim, lien and equity of redemption of the mortgaged premises, the personalty and fixtures attached to or used as a part thereof, and each and every part thereof.

B.   The premises may be declared to be sold in one parcel according to law, subject to zoning restrictions and ordinances adopted by any municipal or other governmental authority, and any violations thereof; subject to any state of facts an accurate survey would show; subject to covenants and restrictions, if any, insofar as they are now in force, contained in former deeds or instruments of record; subject to violations, if any, noted in any federal, state or city agency having authority over the premises. The amount due Plaintiff on the notes and mortgages may be adjudged, from the money

arising from the sale, Plaintiff be paid the amount due it on the notes and mortgages with interest to the time of such payment, the late charge as in the mortgages provided, the expenses of sale, attorneys' fees, and the costs and expenses of this action, together with any sum which may be paid or have been paid by the Plaintiff for taxes, tax claims, water and sewer charges, assessments, fire insurance premiums, and other expenses of preservation of the mortgaged premises and the lien of mortgages upon the mortgaged premises, with appropriate interest thereon so far as such moneys properly applicable thereto will pay the same.

C.  The Plaintiff be decreed to be the owner of any personal property used in connection with the mortgaged premises.

D.  The Defendants, Warburton River View Condo LLC and Jose Espinal, be adjudged to pay any deficiency which may remain after foreclosure of the mortgages.

E.  This Court enter such other and further relief it deems meet under the circumstances.

Respectfully submitted,

By: _____

Richard D. Grossman
Attorney for Plaintiff

Richard D. Grossman
**Law Offices of Richard D. Grossman**
225 West Wacker Drive
20th Floor
Chicago, IL  60606
(312) 750-9308

# EXHIBIT "A"

## STANDING LOAN NOTE

$3,375,000.00

May 17, 2007
New York, New York

1.    **Agreement to Pay.**  **FOR VALUE RECEIVED**, WARBURTON RIVER VIEW CONDO LLC, a New York liability company ("Borrower") hereby promises to pay to the order of BUILDERS BANK, an Illinois banking corporation ("**Lender**"), the principal sum of Three Million Three Hundred Seventy Five Thousand and 00/100 Dollars ($3,375,000.00) ("**Loan**") at the place and in the manner hereinafter provided, together with interest thereon at the rate or rates described below (the "**Interest Rate**"), and any and all other amounts which may be due and payable hereunder from time to time.

2.    **Interest Rate.**

   **2.1    Interest Prior to Default.** Interest shall accrue on the outstanding principal balance of this Note from the date hereof through and including November 5, 2008, ("Maturity Date") at an annual rate equal to the higher of (i) eight percent (8.0%) per annum or (ii) one percent (1.0%) plus the Prime Rate ("Loan Rate"). Changes in the rate of interest to be charged hereunder based on the Prime Rate shall take effect immediately upon the occurrence of any change in the Prime Rate.

      "**Prime Rate**" means the annual rate of interest most recently announced by Bank of America, N.A. its successors and assigns as its prime lending rate of interest. A certificate made by an officer of Lender stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day. The "Prime Rate" is a base reference rate of interest adopted by Lender as a general benchmark from which Lender determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and Borrower acknowledges and agrees that Lender has made no representations whatsoever that the "Prime Rate" is the interest rate actually offered by Lender to borrowers of any particular creditworthiness.

      **2.2    Interest After Default.**  From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default, interest shall accrue on the principal balance of the Loan during any such period at an annual rate ("Default Rate") equal to five percent (5%) plus the Loan Rate; provided, however, in no event shall the Default Rate exceed the maximum rate permitted by law.  The interest accruing under this paragraph shall be immediately due and payable by Borrower to the holder of this Note upon demand, and shall be additional indebtedness evidenced by this Note.

      **2.3    Interest Calculation.**  Interest on this Note shall be calculated on the basis of a 360-day year and the actual number of days elapsed in any portion of a month in which interest is due.

3.    **Payment Terms.**

3.1    **Principal and Interest.** Payments of principal and interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows:

(a)    Interest on the principal balance of this Note accruing from the date the proceeds of the Loan are disbursed by Lender ("**Closing Date**") through and including the fifth day of the month following the month in which the Closing Date occurs shall be due and payable on June 5, 2007.

(b) Commencing on June 5, 2007, and on the fifth (5th) day of each month thereafter through and including the month in which the Maturity Date occurs, interest accrued on the principal balance of the Loan, bearing interest at the Loan Rate, shall be due and payable in full.

(c)    The entire unpaid principal balance of this Note, if not sooner paid or declared to be due in accordance with the terms hereof, together with all accrued and unpaid interest thereon and any other amounts due and payable hereunder or under any other Loan Document (as hereinafter defined), shall be due and payable in full on the Maturity Date.

3.2    **Application of Payments.** Prior to the occurrence of an Event of Default, all payments and prepayments on account of the indebtedness evidenced by this Note shall be applied  as follows: (a) first, to fees, expenses, costs and other similar amounts then due and payable to Lender, including, without limitation any prepayment premium, exit fee or late charges due hereunder, (b) second, to accrued and unpaid interest on the principal balance of this Note, (c) third, to the payment of principal due in the month in which the payment or prepayment is made, (d) fourth, to any escrows, impounds or other amounts which may then be due and payable under the Loan Documents (as hereinafter defined), (e) fifth, to any other amounts then due Lender hereunder or under any of the Loan Documents, and (f) last, to the unpaid principal balance of this Note in the inverse order of maturity.  After an Event of Default has occurred and is continuing, payments may be applied by Lender to amounts owed hereunder and under the Loan Documents in such order as Lender shall determine, in its sole discretion.

3.3    **Method of Payments.** All payments of principal and interest hereunder shall be paid by wire transfer, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as Lender or the legal holder or holders of this Note may from time to time appoint in the payment invoice or otherwise in writing, and in the absence of such appointment, then at the offices of Lender at 77 West Wacker Drive, 31st Floor, Chicago, Illinois 60601.  Payment made by check shall be deemed paid on the date Lender receives such check; provided however, that if such check is subsequently returned to Lender unpaid due to insufficient funds or otherwise, the payment shall not be deemed to have been made and shall continue to bear interest until collected. Notwithstanding the foregoing, the final payment due under this Note must be made by

2

wire transfer or other final funds. All payments received after 3PM local Chicago time will be credited to the following business day in accordance with the Modified Following Business Day Convention.

3.4    **Late Charge.** If any payment of interest or principal due hereunder is not made within five days after such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, Borrower shall pay to Lender a "late charge" of five (5¢) cents for each whole dollar so overdue to defray part of the cost of collection and handling such late payment.

3.5    **Prepayment.** Provided that no Event of Default then exists, Borrower may voluntarily prepay the principal balance of this Note, in whole but not in part, at any time, provided that Borrower shall deliver to Lender written notice of its intention to prepay this Note in full, at least thirty (30) days prior to such payment, which notice shall be irrevocable and shall state the prepayment date. Borrower shall pay to Lender all accrued and unpaid interest through the Prepayment Date on the principal balance being prepaid.

3.6    **Loan Fees.** In consideration of Lender's agreement to make the Loan, Borrower shall pay to Lender a non-refundable fee in the amount of $33,750.00, which shall be due and payable as follows: $33,750.00 was paid by Borrower to Lender prior to the date hereof and the remaining $-0- shall be due and payable in full as a condition precedent to the first disbursement of proceeds under this Note.

4.    **Security.** This Note is secured by a Standing Loan First Mortgage, Security Agreement, and Fixture Filing (**"Mortgage"**) of even date herewith made by Borrower to Lender creating a first mortgage lien on certain real property (**"Premises"**) legally described in Exhibit A attached to the Mortgage, a Guaranty of Payment (**"Guaranty"**) of even date herewith from Jose Espinal (**"Guarantor"**) to Lender and an Environmental Indemnity Agreement (**"Indemnity Agreement"**) of even date herewith from Borrower and Guarantor to Lender, the Mortgage, the Guaranty, the Indemnity Agreement and any other document now or hereafter given to evidence or secure payment of this Note or delivered to induce Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, restated or replaced from time to time, are hereinafter collectively referred to as the **"Loan Documents"**).

5.    **Events of Default.** The occurrence of any one or more of the following events shall constitute an **"Event of Default"** under this Note:

5.1    the failure by Borrower to pay (i) any installment of principal or interest payable pursuant to this Note on the date when due, or (ii) any other amount payable to Lender under this Note, the Mortgage or any of the other Loan Documents within five (5) days after the date when any such payment is due in accordance with the terms hereof or thereof; or

5.2    the occurrence of any "Event of Default" under the Mortgage or any of the other Loan Documents; or

3

8.4     This Note has been made and delivered at New York, New York and all funds disbursed to or for the benefit of Borrower will be disbursed in Chicago, Illinois.

8.5     If this Note is executed by more than one party, the obligations and liabilities of each Borrower under this Note shall be joint and several and shall be binding upon and enforceable against each Borrower and their respective successors and assigns. This Note shall inure to the benefit of and may be enforced by Lender and its successors and assigns.

8.6     If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, the validity and enforceability of the remaining provisions shall not be affected thereby and shall remain in full force and effect.

8.7     If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect by notice in writing to Borrower to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence.  In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Premises are located for the use or detention of money or for forbearance in seeking its collection.  It is expressly stipulated and agreed to be the intent of Lender and Borrower at all times to comply with applicable New York law governing the highest lawful rate or amount of interest payable on the Loan.

8.8     Lender may at any time assign its rights in this Note and the Loan Documents, or any part thereof and transfer its rights in any or all of the collateral, and Lender thereafter shall be relieved from all liability with respect to such collateral.  In addition, Lender may at any time sell one or more participations in this Note.  Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

9.     <u>Notices</u>.  All notices required under this Note will be in writing and will be transmitted in the manner and to the addresses required by the Mortgage, or to such other addresses as Lender and Borrower may specify from time to time in writing.

10.     <u>Consent to Jurisdiction</u>.  **TO INDUCE LENDER TO ACCEPT THIS NOTE, BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING**

5

OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN NEW YORK STATE. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN NEW YORK STATE, WAIVES PERSONAL SERVICE OF PROCESS UPON BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED IN THE MORTGAGE AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

11.     <u>Waiver of Jury Trial.</u> BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

12.     <u>Extension of Maturity Date.</u> Borrower may extend the term of this Note for a six (6) month period as follows:

Provided that no Event of Default as described in the Mortgage exists, or an event which with the passage of time or the giving of notice or both would constitute an Event of Default, Borrower may extend the term of this Note until May 5, 2009 (the "Extended Maturity Date") commencing on the date immediately following the original Maturity Date only if:

(i) Borrower provides Lender with written notice of its intent to so extend the original Maturity Date not less than thirty (30) days prior to the original Maturity Date (the "Extension Notice"),

(ii) concurrent with Borrower's deposit of the Extension Notice with Lender, Borrower provides Lender with an extension fee in an amount equal to .25% of the maximum Loan amount less any previously made principal reductions,

(iii) Borrower provides Lender with updated financial statements and tax returns for Borrower and all Guarantors as requested by and satisfactory to Lender,

(v) Borrower has received all municipal approvals from the City of Yonkers to construct a nine (9) story, ninety-six (96) unit residential condominium of 88,000 SF with ground floor community space of 7,000 SF, on-site parking of 28,000 SF and a full service health club.

6

**IN WITNESS WHEREOF**, Borrower has executed and delivered this Note as of the day and year first written above.

**BORROWER:**

WARBURTON RIVER VIEW CONDO LLC

By: _____

Jose Espinal
Member

STATE OF NEW YORK    )
                                          : ss:
COUNTY OF NEW YORK  )

On the _14th_ day of May in the year 2007 before me, the undersigned, a Notary Public in and for said State, personally appeared personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

STEVEN N. WEISMAN
Notary Public, State of New York
No. 01WE5080950
Qualified in Queens County
Commission Expires June 30, 2007

Notary Public

7

# EXHIBIT "B"

0481
P-52
Not 1-

*This space reserved for Recorder's use only.*

## STANDING LOAN FIRST MORTGAGE, SECURITY AGREEMENT, AND FIXTURE FILING

**by**

### WARBURTON RIVER VIEW CONDO LLC,
a New York limited liability company

**to and for the benefit of**

### BUILDERS BANK,
an Illinois banking corporation

| | |
|---|---|
| **Property Address:** | 1183, 1175 & 1179 Warburton Avenue |
| **City and State:** | Yonkers, New York |
| **County:** | Westchester |
| **Section:** | 3 |
| **Block:** | 3570 |
| **Lots:** | 11, 13, 15 & 16 |

## AFTER RECORDING RETURN TO:

Donovan & Giannuzzi, LLP
261 Madison Avenue
New York, New York 10016
Attn: Alan C. Polacek, Esq.

# TABLE OF CONTENTS

**ARTICLE**                                                                                    **PAGE**

1.    Title................................................................................................................4

2.    Maintenance, Repair, Restoration, Prior Liens, Parking ........................................4

3.    Payment of Taxes and Assessments .....................................................................5

4.    Tax Deposits........................................................................................................5

5.    Lender's Interest In and Use of Deposits ..............................................................6

6.    Insurance..............................................................................................................7

7.    Condemnation.......................................................................................................9

8.    Stamp Tax............................................................................................................9

9.    Lease Assignment ...............................................................................................10

10.   Effect of Extensions of Time and Other Changes ...............................................10

11.   Effect of Changes in Laws Regarding Taxation ..................................................10

12.   Lender's Performance of Defaulted Acts and Expenses Incurred by Lender.........10

13.   Security Agreement ............................................................................................11

14.   Restrictions on Transfer......................................................................................14

15.   Single Asset Entity ............................................................................................16

16.   Events of Default; Acceleration..........................................................................17

17.   Foreclosure; Expense of Litigation.....................................................................19

18.   Application of Proceeds of Foreclosure Sale.......................................................19

19.   Appointment of Receiver....................................................................................19

20.   Lender's Right of Possession in Case of Default .................................................20

21.   Application of Income Received by Lender ..........................................................21

22.   Intentionally Deleted...........................................................................................21

23.   Rights Cumulative ............................................................................................21

24.   Lender's Right of Inspection .........................................................................21

25.   Release Upon Payment and Discharge of Borrower's Obligations..............22

26.   Notices ............................................................................................................22

27.   Waiver of Rights.............................................................................................23

28.   Contests ..........................................................................................................24

29.   Expenses Relating to Note and Mortgage ....................................................24

30.   Financial Statements ......................................................................................25

31.   Statement of Indebtedness .............................................................................26

32.   Further Instruments........................................................................................26

33.   Additional Indebtedness Secured .................................................................26

34.   Indemnity .......................................................................................................26

35.   Subordination of Property Manager's Lien...................................................27

36.   Compliance with Environmental Laws .........................................................27

37.   Intentionally Deleted......................................................................................

38.   Miscellaneous ................................................................................................27

39.   Additional Agreements ..................................................................................30

EXHIBIT A          Legal Description
EXHIBIT B          Permitted Exceptions

## STANDING LOAN FIRST MORTGAGE, SECURITY AGREEMENT, AND FIXTURE FILING

**THIS STANDING LOAN FIRST MORTGAGE, SECURITY AGREEMENT, AND FIXTURE FILING** ("Mortgage") is made as of the _17th_ day of May, 2007, by **WARBURTON RIVER VIEW CONDO LLC**, a New York limited liability company ("Borrower"), having an address at 5041 Broadway, 2nd Floor, New York, New York 10034 to and for the benefit of **BUILDERS BANK**, an Illinois banking corporation ("Lender"), having an address at Suite 3100, 77 West Wacker Drive, Chicago, Illinois 60601.

### RECITALS:

(A)     Lender has agreed to loan to Borrower the principal amount of Three Million Three Hundred Seventy Five Thousand and 00/100 Dollars ($3,375,000.00) ("Loan"). The Loan shall be evidenced by a certain Standing Loan Note of even date herewith (as amended, restated or replaced from time to time, "Note") made by Borrower payable to Lender in the principal amount of $3,375,000.00 and due on November 5, 2008, subject to extension as provided in the Note ("Maturity Date"), except as may be accelerated pursuant to the terms hereof or of the Note, or any other Loan Document (as defined in the Note).

(B)     A condition precedent to Lender's extension of the Loan to Borrower is the execution and delivery by Borrower of this Mortgage.

(C)     As of the time or recording this Mortgage, the entire principal amount secured or to be secured by this Mortgage has been advanced in full and no improvements (as defined in New York State Lien Law Section 2(4)) have commenced or are underway on or at the Project, except improvements for which all costs of improvement have been paid in full. No part of the funds advanced under the Note secured by this Mortgage is intended to be applied for costs of improvement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower agrees as follows:

Borrower hereby mortgages, grants, assigns, remises, releases, warrants and conveys to Lender, its successors and assigns, with power of sale, and grants a security interest in, the following described property, rights and interests (referred to collectively herein as "Premises"), all of which property, rights and interests are hereby pledged primarily and on a parity with the Real Estate (as defined below) and not secondarily:

**THE REAL ESTATE** located in the State of New York and legally described on Exhibit A attached hereto and made a part hereof ("Real Estate");

**TOGETHER WITH** all improvements of every nature whatsoever now or hereafter situated on the Real Estate, and all fixtures and personal property of every nature whatsoever now or hereafter owned by Borrower and on, or used in connection with the Real Estate or the improvements thereon, or in connection with any construction thereon, including all extensions,

additions, improvements, betterments, renewals, substitutions and replacements to any of the foregoing and all of the right, title and interest of Borrower in and to any such personal property or fixtures together with the benefit of any deposits or payments now or hereafter made on such personal property or fixtures by Borrower or on its behalf ("Improvements");

**TOGETHER WITH** all easements, rights of way, gores of real estate, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way now or hereafter belonging, relating or appertaining to the Real Estate, and the reversions, remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of Borrower of, in and to the same;

**TOGETHER WITH** all rents, revenues, issues, profits, proceeds, income, royalties, "accounts," including "health-care-insurance receivables," escrows, letter-of-credit rights (each as defined in the Code hereinafter defined), security deposits, impounds, reserves, tax refunds and other rights to monies from the Premises and/or the businesses and operations conducted by Borrower thereon, to be applied against the Indebtedness (hereinafter defined); provided, however, that Borrower, so long as no Event of Default (as hereinafter defined) has occurred hereunder, may collect rent as it becomes due, but not more than one (1) month in advance thereof;

**TOGETHER WITH** all interest of Borrower in all leases now or hereafter on the Premises, whether written or oral ("Leases"), together with all security therefor and all monies payable thereunder, subject, however, to the conditional permission hereinabove given to Borrower to collect the rentals under any such Lease;

**TOGETHER WITH** all fixtures and articles of personal property now or hereafter owned by Borrower and forming a part of or used in connection with the Real Estate or the Improvements, including, but without limitation, any and all air conditioners, antennae, appliances, apparatus, awnings, basins, bathtubs, bidets, boilers, bookcases, cabinets, carpets, coolers, curtains, dehumidifiers, disposals, doors, drapes, dryers, ducts, dynamos, elevators, engines, equipment, escalators, exercise equipment, fans, fittings, floor coverings, furnaces, furnishings, furniture, hardware, heaters, humidifiers, incinerators, lighting, machinery, motors, ovens, pipes, plumbing, pumps, radiators, ranges, recreational facilities, refrigerators, screens, security systems, shades, shelving, sinks, sprinklers, stokers, stoves, toilets, ventilators, wall coverings, washers, windows, window coverings, wiring, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are or shall be attached to the Real Estate or the Improvements in any manner; it being mutually agreed that all of the aforesaid property owned by Borrower and placed on the Real Estate or the Improvements, so far as permitted by law, shall be deemed to be fixtures, a part of the realty, and security for the Indebtedness (as hereinafter defined); notwithstanding the agreement hereinabove expressed that certain articles of property form a part of the realty covered by this Mortgage and be appropriated to its use and deemed to be realty, to the extent that such agreement and declaration may not be effective and that any of said articles may constitute goods (as said term is used in the Uniform Commercial Code of the State of New York in effect from time to time ("Code"), this instrument

2

shall constitute a security agreement, creating a security interest in such goods, as collateral, in Lender, as a secured party, and Borrower, as Debtor, all in accordance with the Code; and

**TOGETHER WITH** all of Borrower's interests in "general intangibles" including "payment intangibles" and "software" (each as defined in the Code) now owned or hereafter acquired and related to the Premises, including, without limitation, all of Borrower's right, title and interest in and to: (i) all agreements, licenses, permits and contracts to which Borrower is or may become a party and which relate to the Premises; (ii) all obligations and indebtedness owed to Borrower thereunder; (iii) all intellectual property related to the Premises; and (iv) all choses in action and causes of action relating to the Premises;

**TOGETHER WITH** all of Borrower's accounts now owned or hereafter created or acquired as relate to the Premises, including, without limitation, all of the following now owned or hereafter created or acquired by Borrower: (i) accounts, contract rights, health-care-insurance receivables, book debts, notes, drafts, and other obligations or indebtedness owing to the Borrower arising from the sale, lease or exchange of goods or other property and/or the performance of services; (ii) the Borrower's rights in, to and under all purchase orders for goods, services or other property; (iii) the Borrower's rights to any goods, services or other property represented by any of the foregoing; (iv) monies due to become due to the Borrower under all contracts for the sale, lease or exchange of goods or other property and/or the performance of services including the right to payment of any interest or finance charges in respect thereto (whether or not yet earned by performance on the part of the Borrower); (v) "securities", "investment property," "financial assets," and "securities entitlements" (each as defined in the Code), and (vi) proceeds of any of the foregoing and all collateral security and guaranties of any kind given by any person or entity with respect to any of the foregoing; and all warranties, guarantees, permits and licenses in favor of Borrower with respect to the Premises;

**TOGETHER WITH** all proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceeds or the taking of the Premises or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Premises or proceeds of any sale, option or contract to sell the Premises or any portion thereof.

**TO HAVE AND TO HOLD** the Premises, unto Lender, its successors and assigns, forever, for the purposes and upon the uses herein set forth

**PROVIDED, HOWEVER,** that if Borrower shall pay or cause to be paid in full to Lender all of the outstanding Indebtedness, and if Borrower shall have performed or caused to be performed all of the obligations hereunder, in every case subject and pursuant to the other Loan Documents, then Lender shall, at Borrower's expense, deliver to Borrower documents, in recordable form, as shall be necessary to release the Premises from the lien of this Mortgage, in form and substance reasonably satisfactory to Lender, but otherwise this Mortgage shall remain in full force and effect.

**FOR THE PURPOSE OF SECURING:** (i) the payment of the Loan and all interest, late charges, prepayment premium , reimbursement obligations, and other indebtedness

3

evidenced by or owing under the Note, any of the other Loan Documents, together with any extensions, modifications, renewals or refinancings of any of the foregoing; (ii) the performance and observance of the covenants, conditions, agreements, representations, warranties and other liabilities and obligations of Borrower or any other obligor to or benefiting Lender which are evidenced or secured by or otherwise provided in the Note, this Mortgage or any of the other Loan Documents; and (iii) the reimbursement to Lender of any and all sums incurred, expended or advanced by Lender pursuant to any term or provision of or constituting additional indebtedness under or secured by this Mortgage, any of the other Loan Documents, with interest thereon as provided herein or therein (collectively, "Indebtedness").

### IT IS FURTHER UNDERSTOOD AND AGREED THAT:

1. **Title**. Borrower represents, warrants and covenants that (a) Borrower is the holder of the fee simple title to the Premises, free and clear of all liens and encumbrances, except those liens and encumbrances in favor of Lender and as otherwise described on Exhibit B attached hereto ("Permitted Exceptions"); and (b) Borrower has legal power and authority to mortgage and convey the Premises.

2. **Maintenance, Repair, Restoration, Prior Liens, Parking**. Borrower covenants that, so long as any portion of the Indebtedness remains unpaid, Borrower will:

    a. promptly repair, restore or rebuild any Improvements now or hereafter on the Premises which may become damaged or be destroyed to a condition substantially similar to the condition immediately prior to such damage or destruction, whether or not proceeds of insurance are available or sufficient for the purpose (Lender recognizes that the existing structure will be demolished by Borrower);

    b. keep the Premises in good condition and repair, without waste, and free from mechanics', materialmen's or like liens or claims or other liens or claims for lien (subject to Borrower's right to contest liens as permitted by the terms of Paragraph 28 hereof);

    c. pay when due the Indebtedness in accordance with the terms of the Note and the other Loan Documents and duly perform and observe all of the terms, covenants and conditions to be observed and performed by Borrower under the Note, this Mortgage and the other Loan Documents;

    d. pay when due any indebtedness which may be secured by a permitted lien or charge on the Premises on a parity with, superior to or inferior to the lien hereof, and upon request exhibit satisfactory evidence of the discharge of such lien to the Lender (subject to Borrower's right to contest liens as permitted by the terms of Paragraph 28 hereof);

    e. complete within a reasonable time any Improvements now or at any time in the process of erection upon the Premises;

4

current calendar year become due, shall be sufficient to pay in full such installment of annual Taxes, as estimated by Lender.   Such deposits are to be held without any allowance of interest and are to be used for the payment of Taxes next due and payable when they become due.  So long as no Event of Default shall exist, Lender shall, at its option, pay such Taxes when the same become due and payable (upon submission of appropriate bills therefor from Borrower) or shall release sufficient funds to Borrower for the payment thereof.  If the funds so deposited are insufficient to pay any such Taxes for any year (or installments thereof, as applicable) when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written demand therefor, deposit additional funds as may be necessary to pay such Taxes in full.  If the funds so deposited exceed the amount required to pay such Taxes for any year, the excess shall be applied toward subsequent deposits.  Said deposits need not be kept separate and apart from any other funds of Lender.   Lender, in making any payment hereby authorized relating to Taxes, may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

    a.  Notwithstanding anything contained in this paragraph to the contrary, Lender shall have no obligation to pay such Taxes against the Premises from the amounts collected by Lender pursuant to this paragraph if (a) any Event of Default has occurred under any of the Loan Documents or (b) Borrower fails to provide Lender with a written request to pay such Taxes against the Premises at least ten (10) business days prior to the date on which the same become delinquent or past due and further provided that such written request from Borrower includes a duplicate copy of the applicable bill for such Taxes against the Premises which Borrower specified in such request to be paid from such amounts held by Lender pursuant to this paragraph.   Borrower agrees to indemnify, defend and hold Lender harmless from any loss, cost, expense, claim, penalty or charge (including reasonable attorneys fees) that result from Borrower's failure to comply with the foregoing.

5.  **Lender's Interest In and Use of Deposits**.  Upon an Event of Default, Lender may, at its option, apply any monies at the time on deposit pursuant to Paragraph 4 hereof to cure an Event of Default or to pay any of the Indebtedness in such order and manner as Lender may elect.  If such deposits are used to cure an Event of Default or pay any of the Indebtedness, Borrower shall immediately, upon demand by Lender, deposit with Lender an amount equal to the amount expended by Borrower from the deposits.  When the Indebtedness has been fully paid, any remaining deposits shall be returned to Borrower. Such deposits are hereby pledged as additional security for the Indebtedness and shall not be subject to the direction or control of Borrower.  Lender shall not be liable for any failure to apply to the payment of Taxes any amount so deposited unless Borrower, prior to an Event of Default, shall have requested Lender in writing to make application of such funds to the payment of such amounts, accompanied by the bills for such Taxes.  Lender shall not be liable for any act or omission taken in good faith or pursuant to the instruction of any party.

6

6. **Insurance**.

   a. Borrower shall at all times keep all buildings, Improvements, fixtures and articles of personal property now or hereafter situated on the Premises insured against loss or damage by fire and such other hazards as may reasonably be required by Lender, in accordance with the terms, coverages and provisions as may be reasonably required by Lender, and such other insurance as Lender may from time to time reasonably require. Unless Borrower provides Lender evidence of the insurance coverages required hereunder, Lender may purchase insurance at Borrower's expense to cover Lender's interest in the Premises. The insurance may, but need not, protect Borrower's interest. The coverages that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Premises. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Mortgage. If Lender purchases insurance for the Premises, Borrower will be responsible for the costs of such insurance, including, without limitation, interest and any other charges which Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Indebtedness. The cost of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

   b. Borrower shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained hereunder unless Lender is included thereon as the loss payee or an additional insured as applicable, under a standard mortgage clause acceptable to Lender and such separate insurance is otherwise acceptable to Lender.

   c. In the event of loss, Borrower shall give prompt notice thereof to Lender, who, shall have the sole and absolute right to make proof of loss. If the conditions set forth in clauses (i) and (ii) of the immediately succeeding sentence are not satisfied, then Lender, solely and directly shall receive such payment for loss from each insurance company concerned. If and only if (i) no Event of Default or event that with the passage of time, the giving of notice or both would constitute an Event of Default then exists, and (ii) Lender determines that the work required to complete the repair or restoration of the Premises necessitated by such loss can be completed no later than six (6) months prior to the Maturity Date, then Lender shall endorse to Borrower any such payment and Borrower may collect such payment directly. Lender shall have the right, at its option and in its sole discretion, to apply any insurance proceeds received by Lender pursuant to the terms of this paragraph, after the payment of all of Lender's expenses, either (i) on account of the Indebtedness, irrespective of whether such principal balance is then due and payable, whereupon Lender may declare the whole of the balance of Indebtedness to be due and payable in full, or (ii) to the restoration or repair of the property damaged as provided in subparagraph d below; provided, however,

that Lender hereby agrees to permit the application of such proceeds to the restoration or repair of the damaged property, subject to the provisions of subparagraph d below, if (i) Lender has received satisfactory evidence that such restoration or repair shall be completed no later than the date that is six (6) months prior to the Maturity Date, and (ii) no Event of Default, or event that with the passage of time, the giving of notice or both would constitute an Event of Default, then exists. If insurance proceeds are made available to Borrower by Lender as hereinafter provided, Borrower shall repair, restore or rebuild the damaged or destroyed portion of the Premises so that the condition and value of the Premises are substantially the same as the condition and value of the Premises prior to being damaged or destroyed. In the event of foreclosure of this Mortgage, all right, title and interest of Borrower in and to any insurance policies then in force shall pass to the purchaser at the foreclosure sale.

d.  If insurance proceeds are made available by Lender to Borrower, Borrower shall comply with the following conditions:

    i.  Before commencing to repair, restore or rebuild following damage to, or destruction of, all or a portion of the Premises, whether by fire or other casualty, Borrower shall obtain from Lender its approval of all site and building plans and specifications pertaining to such repair, restoration or rebuilding.

    ii.  Prior to each payment or application of any insurance proceeds to the repair or restoration of the improvements upon the Premises to the extent permitted in subparagraph c above (which payment or application may be made, at Lender's option, through an escrow, the terms and conditions of which are satisfactory to Lender and the cost of which is to be borne by Borrower), Lender shall be satisfied as to the following:

        1.  no Event of Default or any event which, with the passage of time or giving of notice would constitute an Event of Default, has occurred;

        2.  either such Improvements have been fully restored, or the expenditure of money as may be received from such insurance proceeds will be sufficient to repair, restore or rebuild the Premises, free and clear of all liens, claims and encumbrances, except the lien of this Mortgage and the Permitted Exceptions, or, if such insurance proceeds shall be insufficient to repair, restore and rebuild the Premises, Borrower has deposited with Lender such amount of money which, together with the insurance proceeds shall be sufficient to restore, repair and rebuild the Premises; and

        3.  prior to each disbursement of any such proceeds, Lender shall be furnished with a statement of Lender's architect (the cost of which

8

shall be borne by Borrower), certifying the extent of the repair and restoration completed to the date thereof, and that such repairs, restoration, and rebuilding have been performed to date in conformity with the plans and specifications approved by Lender and with all statutes, regulations or ordinances (including building and zoning ordinances) affecting the Premises; and Lender shall be furnished with appropriate evidence of payment for labor or materials furnished to the Premises, and total or partial lien waivers substantiating such payments.

iii. If Borrower shall fail to restore, repair or rebuild the Improvements within a time deemed satisfactory by Lender, then Lender, at its option, may (1) commence and perform all necessary acts to restore, repair or rebuild the said Improvements for or on behalf of Borrower, or (2) declare an Event of Default. If insurance proceeds shall exceed the amount necessary to complete the repair, restoration or rebuilding of the Improvements, such excess shall be applied on account of the Indebtedness irrespective of whether such Indebtedness is then due and payable without payment of any premium or penalty.

7. **Condemnation**. If all or any part of the Premises are damaged, taken or acquired, either temporarily or permanently, in any condemnation proceeding, or by exercise of the right of eminent domain, the amount of any award or other payment for such taking or damages made in consideration thereof, to the extent of the full amount of the remaining unpaid Indebtedness, is hereby assigned to Lender, who is empowered to collect and receive the same and to give proper receipts therefor in the name of Borrower and the same shall be paid forthwith to Lender. Such award or monies shall be applied on account of the Indebtedness, irrespective of whether such Indebtedness is then due and payable and, at any time from and after the taking Lender may declare the whole of the balance of the Indebtedness to be due and payable in full. Notwithstanding the provisions of this paragraph to the contrary, if any condemnation or taking of less than the entire Premises occurs and provided that no Event of Default and no event or circumstance which with the passage of time, the giving of notice or both would constitute an Event of Default then exists, and if such partial condemnation, in the reasonable discretion of Lender, has no material adverse effect on the operation or value of the Premises, then the award or payment for such taking or consideration for damages resulting therefrom may be collected and received by Borrower, and Lender hereby agrees that in such event it shall not declare the Indebtedness to be due and payable, if it is not otherwise then due and payable.

8. **Stamp Tax**. If, by the laws of the United States of America, or of any state or political subdivision having jurisdiction over Borrower, any tax is due or becomes due in respect of the execution and delivery of this Mortgage, the Note or any of the other Loan Documents, Borrower shall pay such tax in the manner required by any such law. Borrower further agrees to reimburse Lender for any sums which Lender may expend by

reason of the imposition of any such tax. Notwithstanding the foregoing, Borrower shall not be required to pay any income or franchise taxes of Lender.

9. **Lease Assignment**.    Borrower acknowledges that, as additional security for the repayment of the Loan, Borrower has assigned to Lender interests in the leases of the Premises and the rents and income from the Premises. Upon the occurrence of a default under this Mortgage which has not been cured within any applicable grace or cure period, Lender shall be entitled to exercise any or all of the remedies provided in this Mortgage including without limitation, the appointment of a receiver, without notice to Borrower and without regard to the value of the Premises. This assignment shall continue in full force and effect during any period of foreclosure or redemption with respect to the Premises.

10. **Effect of Extensions of Time and Other Changes**. If the payment of the Indebtedness or any part thereof is extended or varied, if any part of any security for the payment of the Indebtedness is released, if the rate of interest charged under the Note is changed or if the time for payment thereof is extended or varied, all persons now or at any time hereafter liable therefor, or interested in the Premises or having an interest in Borrower, shall be held to assent to such extension, variation, release or change and their liability and the lien and all of the provisions hereof shall continue in full force, any right of recourse against all such persons being expressly reserved by Lender, notwithstanding such extension, variation, release or change.

11. **Effect of Changes in Laws Regarding Taxation**. If any law is enacted after the date hereof requiring (a) the deduction of any lien on the Premises from the value thereof for the purpose of taxation or (b) the imposition upon Lender of the payment of the whole or any part of the Taxes, charges or liens herein required to be paid by Borrower, or (c) a change in the method of taxation of mortgages or debts secured by mortgages or Lender's interest in the Premises, or the manner of collection of taxes, so as to affect this Mortgage or the Indebtedness or the holders thereof, then Borrower, upon demand by Lender, shall pay such Taxes or charges, or reimburse Lender therefor; provided, however, that Borrower shall not be deemed to be required to pay any income or franchise taxes of Lender. Notwithstanding the foregoing, if in the opinion of counsel for Lender it is or may be unlawful to require Borrower to make such payment or the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then Lender may declare all of the Indebtedness to be immediately due and payable.

12. **Lender's Performance of Defaulted Acts and Expenses Incurred by Lender**. If an Event of Default has occurred, Lender may, but need not, make any payment or perform any act herein required of Borrower in any form and manner deemed expedient by Lender, and may, but need not, make full or partial payments of principal or interest on prior encumbrances, if any, and purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting the Premises or consent to any tax or assessment or cure any default of Borrower in any lease of the Premises. All monies paid for any of the purposes herein

10

authorized and all expenses paid or incurred in connection therewith, including reasonable attorneys' fees, and any other monies advanced by Lender in regard to any tax referred to in Paragraph 8 above or to protect the Premises or the lien hereof, shall be so much additional Indebtedness, and shall become immediately due and payable by Borrower to Lender, upon demand, and with interest thereon accruing from the date of such demand until paid at the Default Rate (as defined in the Note) then in effect. In addition to the foregoing, any costs, expenses and fees, including reasonable attorneys' fees, incurred by Lender in connection with (a) sustaining the lien of this Mortgage or its priority, (b) protecting or enforcing any of Lender's rights hereunder, (c) recovering any Indebtedness, (d) any litigation or proceedings affecting the Note, this Mortgage, any of the other Loan Documents or the Premises, including without limitation, bankruptcy and probate proceedings, or (e) preparing for the commencement, defense or participation in any threatened litigation or proceedings affecting the Note, this Mortgage, any of the other Loan Documents or the Premises, shall be so much additional Indebtedness, and shall become immediately due and payable by Borrower to Lender, upon demand, and with interest thereon accruing from the date of such demand until paid at the Default Rate. The interest accruing under this Paragraph 12 shall be immediately due and payable by Borrower to Lender, and shall be additional Indebtedness evidenced by the Note and secured by this Mortgage. Lender's failure to act shall never be considered as a waiver of any right accruing to Lender on account of any Event of Default. Should any amount paid out or advanced by Lender hereunder, or pursuant to any agreement executed by Borrower in connection with the Loan, be used directly or indirectly to pay off, discharge or satisfy, in whole or in part, any lien or encumbrance upon the Premises or any part thereof, then Lender shall be subrogated to any and all rights, equal or superior titles, liens and equities, owned or claimed by any owner or holder of said outstanding liens, charges and indebtedness, regardless of whether said liens, charges and indebtedness are acquired by assignment or have been released of record by the holder thereof upon payment.

13. **Security Agreement**. Borrower and Lender agree that this Mortgage shall constitute a Security Agreement within the meaning of the Code with respect to (a) all sums at any time on deposit for the benefit of Borrower or held by the Lender (whether deposited by or on behalf of Borrower or anyone else) pursuant to any of the provisions of this Mortgage or the other Loan Documents, and (b) with respect to any personal property included in the granting clauses of this Mortgage, which personal property may not be deemed to be affixed to the Premises or may not constitute a "fixture" (within the meaning of Section 9-102(41) of the Code) (which property is hereinafter referred to as "Personal Property"), and all replacements of, substitutions for, additions to, and the proceeds thereof, and the "supporting obligations" (as defined in the Code) (all of said Personal Property and the replacements, substitutions and additions thereto and the proceeds thereof being sometimes hereinafter collectively referred to as "Collateral"), and that a security interest in and to the Collateral is hereby granted to the Lender, and the Collateral and all of Borrower's right, title and interest therein are hereby assigned to Lender, all to secure payment of the Indebtedness. All of the provisions contained in this Mortgage pertain and apply to the Collateral as fully and to the same extent as to any

other property comprising the Premises; and the following provisions of this Paragraph shall not limit the applicability of any other provision of this Mortgage but shall be in addition thereto:

a.  Borrower (being the Debtor as that term is used in the Code) is and will be the true and lawful owner of the Collateral and has rights in and the power to transfer the Collateral, subject to no liens, charges or encumbrances other than the lien hereof, other liens and encumbrances benefiting Lender and no other party, and liens and encumbrances, if any, expressly permitted by the other Loan Documents.

b.  The Collateral is to be used by Borrower solely for business purposes.

c.  The Collateral will be kept at the Real Estate and, except for Obsolete Collateral (as hereinafter defined), will not be removed therefrom without the consent of Lender (being the Secured Party as that term is used in the Code). The Collateral may be affixed to the Real Estate but will not be affixed to any other real estate.

d.  The only persons having any interest in the Premises are Borrower, Lender and holders of interests, if any, expressly permitted hereby.

e.  No Financing Statement (other than Financing Statements showing Lender as the sole secured party, or with respect to liens or encumbrances, if any, expressly permitted hereby) covering any of the Collateral or any proceeds thereof is on file in any public office except pursuant hereto; and Borrower, at its own cost and expense, upon demand, will furnish to Lender such further information and will execute and deliver to Lender such financing statements and other documents in form satisfactory to Lender and will do all such acts as Lender may request at any time or from time to time or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the Indebtedness, subject to no other liens or encumbrances, other than liens or encumbrances benefiting Lender and no other party and liens and encumbrances (if any) expressly permitted hereby; and Borrower will pay the cost of filing or recording such financing statements or other documents, and this instrument, in all public offices wherever filing or recording is deemed by Lender to be desirable. Borrower hereby irrevocably authorizes Lender at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral as all assets of Borrower (or words of similar effect), regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, or as being of an equal or lesser scope or within greater detail, and (ii) contain any other information required by Part V of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower, and

in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. Borrower agrees to furnish any such information to Lender promptly upon request. Borrower further ratifies and affirms its authorization for any financing statements and/or amendments thereto, executed and filed by Lender in any jurisdiction prior to the date of this Mortgage.

f. Upon an Event of Default hereunder, Lender shall have the remedies of a secured party under the Code, including, without limitation, the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose, so far as Borrower can give authority therefor, with or without judicial process, may enter (if this can be done without breach of the peace) upon any place which the Collateral or any part thereof may be situated and remove the same therefrom (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Code); and Lender shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to Borrower's right of redemption in satisfaction of Borrower's obligations, as provided in the Code. Lender may render the Collateral unusable without removal and may dispose of the Collateral on the Premises. Lender may require Borrower to assemble the Collateral and make it available to Lender for its possession at a place to be designated by Lender which is reasonably convenient to both parties. Lender will give Borrower at least ten (10) days' notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is made. The requirements of reasonable notice shall be met if such notice is mailed, by certified United States mail or equivalent, postage prepaid, to the address of Borrower hereinafter set forth at least ten (10) days before the time of the sale or disposition. Lender may buy at any public sale. Lender may buy at private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations. Any such sale may be held in conjunction with any foreclosure sale of the Premises. If Lender so elects, the Premises and the Collateral may be sold as one lot. The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale, selling and the reasonable attorneys' fees and legal expenses incurred by Lender, shall be applied against the Indebtedness in such order or manner as Lender shall select. Lender will account to Borrower for any surplus realized on such disposition.

g. The terms and provisions contained in this Paragraph 13, unless the context otherwise requires, shall have the meanings and be construed as provided in the Code.

h. This Mortgage is intended to be a financing statement within the purview of Section 9-502(c) of the Code with respect to the Collateral and the goods described herein, which goods are or may become fixtures relating to the

Premises.  The addresses of Borrower (Debtor) and Lender (Secured Party) are hereinbelow set forth.  This Mortgage is to be filed for recording with the Recorder of Deeds of the county or counties where the Premises are located.

i.  To the extent permitted by applicable law, the security interest created hereby is specifically intended to cover all Leases between Borrower or its agents as lessor, and various tenants named therein, as lessee, including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of said Leases, together with all of the right, title and interest of Borrower, as lessor thereunder.

j.  Borrower represents and warrants that:

    i.  Borrower is the record owner of the Premises;

    ii.  Borrower's chief executive office is located in the State of New York;

    iii.  Borrower's state of formation, is the State of New York;

    iv.  Borrower's exact legal name is as set forth in the first paragraph of this Mortgage; and

    v.  Borrower does not have an organizational identification number.

k.  Borrower agrees that:

    i.  Where Collateral is in possession of a third party, Borrower will join with the Lender in notifying the third party of the Lender's interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender;

    ii.  Borrower will cooperate with the Lender in obtaining control with respect to Collateral consisting of: deposit accounts, investment property, letter of credit rights and electronic chattel paper; and

    iii.  Until the Indebtedness is paid in full, Borrower will not change the state where it is located or change its company name without giving the Lender at least 30 days' prior written notice in each instance.

14. **Restrictions on Transfer**.

a.  Borrower, without the prior written consent of Lender, shall not effect, suffer or permit any Prohibited Transfer (as defined herein). Any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation (or any agreement to do any of the foregoing) of any of the following properties or interests shall constitute a "Prohibited Transfer":

14

i. The Premises or any part thereof or interest therein, excepting only sales or other dispositions of Collateral (herein called "Obsolete Collateral") no longer useful in connection with the operation of the Premises, provided that prior to the sale or other disposition thereof, such Obsolete Collateral has been replaced by Collateral of at least equal value and utility which is subject to the lien hereof with the same priority as with respect to the Obsolete Collateral;

ii. Any shares of capital stock of a corporate Borrower, a corporation which is a general partner or managing member/manager in a partnership or limited liability company Borrower, or a corporation which is the owner of substantially all of the capital stock of any corporation described in this subparagraph (other than the shares of capital stock of a corporate trustee or a corporation whose stock is publicly traded on a national securities exchange or on the National Association of Securities Dealers' Automated Quotation System);

iii. All or any part of the managing member or manager interest, as the case may be, in a limited liability company Borrower or a limited liability company which is a general partner of a partnership Borrower;

iv. All or any part of the general partner or joint venture interest, as the case may be, of a partnership Borrower or a partnership which is a manager of a limited liability company Borrower or the conversion of a partnership Borrower to a corporation or limited liability company; or

v. If there shall be any change in control (by way of transfers of stock, partnership or member interests or otherwise) of Borrower or in any partner, member, manager or shareholder, as applicable, which directly or indirectly controls the day-to-day operations and management of Borrower and/or owns a controlling interest in Borrower.

in each case whether any such conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrance or alienation is effected directly, indirectly (including the nominee agreement), voluntarily or involuntarily, by operation of law or otherwise; provided, however, that the foregoing provisions of this Paragraph 14 shall not apply (i) to liens securing the Indebtedness, (ii) to the lien of current taxes and assessments not in default, (iii) to any transfers of the Premises, or part thereof, or interest therein, or any beneficial interests, or shares of stock or partnership or joint venture interests, as the case may be, by or on behalf of an owner thereof who is deceased or declared judicially incompetent, to such owner's heirs, legatees, devisees, executors, administrators, estate or personal representatives, or (iv) to leases permitted by the terms of the Loan Documents, if any.

b. In determining whether or not to make the Loan, Lender evaluated the background and experience of Borrower and its partners/members/officers in owning and

15

operating property such as the Premises, found it acceptable and relied and continues to rely upon same as the means of maintaining the value of the Premises which is Lender's security for the Note. Borrower and its partners/members/officers are well experienced in borrowing money and owning and operating property such as the Premises, were ably represented by a licensed attorney at law in the negotiation and documentation of the Loan and bargained at arm's length and without duress of any kind for all of the terms and conditions of the Loan, including this provision. Borrower recognizes that Lender is entitled to keep its loan portfolio at current interest rates by either making new loans at such rates or collecting assumption fees and/or increasing the interest rate on a loan, the security for which is purchased by a party other than the original Borrower. Borrower further recognizes that any secondary junior financing placed upon the Premises (a) may divert funds which would otherwise be used to pay the Note; (b) could result in acceleration and foreclosure by any such junior encumbrancer which would force Lender to take measures and incur expenses to protect its security; (c) would detract from the value of the Premises should Lender come into possession thereof with the intention of selling same; and (d) would impair Lender's right to accept a deed in lieu of foreclosure, as a foreclosure by Lender would be necessary to clear the title to the Premises. In accordance with the foregoing and for the purposes of (i) protecting Lender's security, both of repayment and of value of the Premises; (ii) giving Lender the full benefit of its bargain and contract with Borrower; (iii) allowing Lender to raise the interest rate (in accordance with the Note) and collect assumption fees; and (iv) keeping the Premises free of subordinate financing liens, Borrower agrees that if this Paragraph 14 is deemed a restraint on alienation, that it is a reasonable one. Notwithstanding the foregoing restrictions contained in Article 14 Borrower may transfer non-controlling membership interests to third parties provided Jose Espinal remains sole Managing Member of Borrower, under Article 39-s hereof.

15. **Single Asset Entity**. Borrower shall not hold or acquire, directly or indirectly, any ownership interest (legal or equitable) in any real or personal property other than the Premises, or become a shareholder of or a member or partner in any entity which acquires any property other than the Premises, until such time as the Indebtedness has been fully repaid. Borrower's articles of incorporation, partnership agreement or operating agreement, as applicable, shall limit its purpose to the acquisition, operation, management and disposition of the Premises, and such purposes shall not be amended without the prior written consent of Lender. Borrower covenants:

   a. To maintain its assets, accounts, books, records, financial statements, stationery, invoices, and checks separate from and not commingled with any of those of any other person or entity;

   b. To conduct its own business in its own name, pay its own liabilities out of its own funds, allocate fairly and reasonably any overhead for shared employees and office space, and to maintain an arm's length relationship with its affiliates;

16

c. To hold itself out as a separate entity, correct any known misunderstanding regarding its separate identity, maintain adequate capital in light of its contemplated business operations, and observe all organizational formalities;

d. Not to guarantee or become obligated for the debts of any other entity or person or hold out its credits as being available to satisfy the obligations of others, including not acquiring obligations or securities of its partners, members or shareholders;

e. Not to pledge its assets for the benefit of any other entity or person or make any loans or advances to any person or entity;

f. Not to enter into any contract or agreement with any party which is directly or indirectly controlling, controlled by or under common control with Borrower (an "Affiliate"), except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any Affiliate;

g. Neither Borrower nor any constituent party of Borrower will seek the dissolution or winding up, in whole or in part, of Borrower, nor will Borrower merge with or be consolidated into any other entity;

h. Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any constituent party of Borrower, Affiliate, any guarantor of the Note or any other person; and

i. Borrower now has and will hereafter have no debts or obligations other than normal accounts payable in the ordinary course of business, this Mortgage, and the Loan; and any other indebtedness or other obligation of Borrower has been paid in full prior to or through application of proceeds from the funding of the Loan.

16. **Events of Default; Acceleration**. Each of the following shall constitute an "Event of Default" for purposes of this Mortgage:

a. Borrower fails to pay any installment of principal or interest payable pursuant to the Note, or any other amount payable to Lender under the Note, this Mortgage or any of the other Loan Documents on the date when any such payment is due in accordance with the terms hereof or thereof;

b. Borrower fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower under the Note, this Mortgage or any of the other Loan Documents; provided, however, that if such failure by its nature can be cured, then so long as the continued operation and safety of the Premises, and the priority, validity and enforceability of the liens created by the Mortgage or any of the other Loan Documents and the value of the Premises are not impaired,

17

threatened or jeopardized, then Borrower shall have a period ("Cure Period") of thirty (30) days after Borrower obtains actual knowledge of such failure and receives written notice from Lender of such failure to cure the same and an Event of Default shall not be deemed to exist during the Cure Period, provided further that if Borrower commences to cure such failure during the Cure Period and is diligently and in good faith attempting to effect such cure, the Cure Period shall be extended for thirty (30) additional days, but in no event shall the Cure Period be longer than sixty (60) days in the aggregate;

c.  the existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Mortgage or any of the other Loan Documents or of any statement or certification as to facts delivered to Lender by Borrower or any guarantor of the Note;

d.  Borrower or any guarantor of the Note files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal, state, or other statute or law, or seeks or consents to or acquiesces in the appointment of any trustee, receiver or similar officer of Borrower or of all or any substantial part of the property of Borrower or any guarantor of the Note or any of the Premises or all or a substantial part of the assets of Borrower or any guarantor of the Note are attached, seized, subjected to a writ or distress warrant or are levied upon unless the same is released or located within thirty (30) days;

e.  the commencement of any involuntary petition in bankruptcy against Borrower or any guarantor of the Note or the institution against Borrower or any guarantor of the Note of any reorganization, arrangement, composition, readjustment, dissolution, liquidation or similar proceedings under any present or future federal, state or other statute or law, or the appointment of a receiver, trustee or similar officer for all or any substantial part of the property of Borrower or any guarantor of the Note which shall remain undismissed or undischarged for a period of sixty (60) days;

f.  the dissolution, termination or merger of Borrower or the occurrence of the death or declaration of legal incompetency of any individual guarantor of the Note;

g.  the occurrence of a Prohibited Transfer;

h.  the occurrence of an "Event of Default" under the Note any of the other Loan Documents; or

i.  If an Event of Default occurs, Lender may, at its option, declare the whole of the Indebtedness to be immediately due and payable without further notice to Borrower, with interest thereon accruing from the date of such Event of Default until paid at the Default Rate.

17. **Foreclosure; Expense of Litigation**.

      a.  When all or any part of the Indebtedness shall become due, whether by acceleration or otherwise, Lender shall have the right to foreclose the lien hereof for such Indebtedness or part thereof and/or exercise any right, power or remedy provided in this Mortgage or any of the other Loan Documents in accordance with applicable law.  In the event of a foreclosure sale, Lender is hereby authorized, without the consent of Borrower, to assign any and all insurance policies to the purchaser at such sale or to take such other steps as Lender may deem advisable to cause the interest of such purchaser to be protected by any of such insurance policies.

      b.  In any suit to foreclose the lien hereof, there shall be allowed and included as additional indebtedness in the decree for sale all expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable attorneys' fees, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs, and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to the title as Lender may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of the Premises.  All expenditures and expenses of the nature mentioned in this paragraph and such other expenses and fees as may be incurred in the enforcement of Borrower's obligations hereunder, the protection of said Premises and the maintenance of the lien of this Mortgage, including the reasonable fees of any attorney employed by Lender in any litigation or proceeding affecting this Mortgage, the Note, or the Premises, including probate and bankruptcy proceedings, or in preparations for the commencement or defense of any proceeding or threatened suit or proceeding shall be immediately due and payable by Borrower, with interest thereon until paid at the Default Rate and shall be secured by this Mortgage.

18. **Application of Proceeds of Foreclosure Sale**.  The proceeds of any foreclosure sale of the Premises shall be distributed and applied in accordance with the provisions hereof and any applicable law and, unless otherwise specified therein, in such order as Lender may determine in its sole and absolute discretion.

19. **Appointment of Receiver**.  Upon or at any time after the filing of a complaint to foreclose this Mortgage, the court in which such complaint is filed shall, upon petition by Lender, appoint a receiver for the Premises, without notice to Borrower and without regard to the value of the Premises. Such appointment may be made either before or after sale, without notice, without regard to the solvency or insolvency of Borrower at the time of application for such receiver and without regard to the value of the Premises or

whether the same shall be then occupied as a homestead or not and Lender hereunder or any other holder of the Note may be appointed as such receiver. Such receiver shall have power to collect the rents, issues and profits of the Premises (i) during the pendency of such foreclosure suit, (ii) in case of a sale and a deficiency, during the full statutory period of redemption, whether there be redemption or not, and (iii) during any further times when Borrower, but for the intervention of such receiver, would be entitled to collect such rents, issues and profits. Such receiver also shall have all other powers and rights that may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Premises during said period, including, to the extent permitted by law, the right to lease all or any portion of the Premises for a term that extends beyond the time of such receiver's possession without obtaining prior court approval of such lease. The court from time to time may authorize the application of the net income received by the receiver in payment of (a) the Indebtedness, or by any decree foreclosing this Mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale, and (b) any deficiency upon a sale and deficiency.

20. **Lender's Right of Possession in Case of Default**. At any time after an Event of Default has occurred, Borrower shall, upon demand of Lender, surrender to Lender possession of the Premises. Lender, in its discretion, may, with process of law, enter upon and take and maintain possession of all or any part of the Premises, together with all documents, books, records, papers and accounts relating thereto, and may exclude Borrower and its employees, agents or servants therefrom, and Lender may then hold, operate, manage and control the Premises, either personally or by its agents. Lender shall have full power to use such measures, legal or equitable, as in its discretion may be deemed proper or necessary to enforce the payment or security of the avails, rents, issues, and profits of the Premises, including actions for the recovery of rent, actions in forcible detainer and actions in distress for rent. Without limiting the generality of the foregoing, Lender shall have full power to:

   a. cancel or terminate any lease or sublease for any cause or on any ground which would entitle Borrower to cancel the same;

   b. elect to disaffirm any lease or sublease which is then subordinate to the lien hereof;

   c. extend or modify any then existing leases and to enter into new leases, which extensions, modifications and leases may provide for terms to expire, or for options to lessees to extend or renew terms to expire, beyond the Maturity Date and beyond the date of the issuance of a deed or deeds to a purchaser or purchasers at a foreclosure sale, it being understood and agreed that any such leases, and the options or other such provisions to be contained therein, shall be binding upon Borrower and all persons whose interests in the Premises are subject to the lien hereof and upon the purchaser or purchasers at any foreclosure sale, notwithstanding any redemption from sale, discharge of the Indebtedness,

satisfaction of any foreclosure judgment, or issuance of any certificate of sale or deed to any purchaser;

d.  make any repairs, renewals, replacements, alterations, additions, betterments and improvements to the Premises as Lender deems are necessary;

e.  insure and reinsure the Premises and all risks incidental to Lender's possession, operation and management thereof; and including, without limitations, improvements consistent with the Loan Agreement;

f.  receive all of such avails, rents, issues and profits.

21. **Application of Income Received by Lender**.  Lender, in the exercise of the rights and powers hereinabove conferred upon it, shall have full power to use and apply the avails, rents, issues and profits of the Premises to the payment of or on account of the following, in such order as Lender may determine:

a.  to the payment of the operating expenses of the Premises, including cost of management and leasing thereof (which shall include compensation to Lender and its agent or agents, if management be delegated to an agent or agents, and shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; and costs incurred in connection with improvements to the Premises;

b.  to the payment of taxes and special assessments now due or which may hereafter become due on the Premises; and

c.  to the payment of any Indebtedness, including any deficiency which may result from any foreclosure sale.

22. **Intentionally Reserved**.

23. **Rights Cumulative**.  Each right, power and remedy herein conferred upon Lender is cumulative and in addition to every other right, power or remedy, express or implied, given now or hereafter existing under any of the Loan Documents or at law or in equity, and each and every right, power and remedy herein set forth or otherwise so existing may be exercised from time to time as often and in such order as may be deemed expedient by Lender, and the exercise or the beginning of the exercise of one right, power or remedy shall not be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy, and no delay or omission of Lender in the exercise of any right, power or remedy accruing hereunder or arising otherwise shall impair any such right, power or remedy, or be construed to be a waiver of any Event of Default or acquiescence therein.

24. **Lender's Right of Inspection**.  Lender and its representatives shall have the right to inspect the Premises and the books and records with respect thereto at all reasonable

times upon not less than twenty-four (24) hours prior notice to Borrower, and access thereto, subject to the rights of tenants in possession, shall be permitted for that purpose.

25. **Release Upon Payment and Discharge of Borrower's Obligations**. Lender shall release this Mortgage and the lien hereof by proper instrument upon payment and discharge of all Indebtedness, including payment of all reasonable expenses incurred by Lender in connection with the execution of such release.

26. **Notices**. Any notices, communications and waivers under this Mortgage shall be in writing and shall be (i) delivered in person, (ii) sent via facsimile, (iii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (iv) by overnight express carrier, addressed in each case as follows:

To Lender:

> Builders Bank
> 77 West Wacker Drive
> Suite 3100
> Chicago, Illinois 60601
> Attn: Portfolio Management
> Fax (312) 696-0090

With a copy to:

> Donovan & Giannuzzi, LLP
> 261 Madison Avenue
> New York, New York 10016
> Attn: Alan C. Polacek, Esq.
> Fax (212) 223-0966
>
> -and-
>
> Builder's Bank
> 1001 Franklin Avenue, Suite #210
> Garden City, New York 11530
> Attn: Jeffrey S. Wall
> Fax: (516)-333-9232

To Borrower:

> c/o ET Management
> 5041 Broadway, 2nd Floor
> New York, New York 10034
> Fax: (212) 569-2225

With copy to:     Karen Sherman, Esq.
          1501 Broadway, Suite 2401
          New York, New York 10036
          Fax: (212) 302-9012

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this Paragraph shall be deemed received (i) if personally delivered or sent via facsimile, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

27. **Waiver of Rights**. The Borrower hereby covenants and agrees that it will not at any time insist upon or plead, or in any manner claim or take any advantage of, any stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter in force providing for the valuation or appraisement of the Premises, or any part thereof, prior to any sale or sales thereof to be made pursuant to any provisions herein contained, or to decree, judgment or order of any court of competent jurisdiction; or, after such sale or sales, claim or exercise any rights under any statute now or hereafter in force to redeem the property so sold, or any part thereof, or relating to the marshalling thereof, upon foreclosure sale or other enforcement hereof; and without limiting the foregoing:

 a. The Borrower hereby expressly waives any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Mortgage, on its own behalf and on behalf of each and every person, it being the intent hereof that any and all such rights of reinstatement and redemption of the Borrower and of all other persons are and shall be deemed to be hereby waived to the full extent permitted under applicable law;

 b. The Borrower will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to the Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

 c. If the Borrower is a trustee, Borrower represents that the provisions of this paragraph (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

28. **Contests**. Notwithstanding anything to the contrary herein contained, Borrower shall have the right to contest by appropriate legal proceedings diligently prosecuted any Taxes imposed or assessed upon the Premises or which may be or become a lien thereon and any mechanics', materialmen's or other liens or claims for lien upon the Premises (all herein called "Contested Liens"), and no Contested Liens shall constitute an Event of Default hereunder, if, but only if:

    a. Borrower shall forthwith give notice of any Contested Lien to Lender at the time the same shall be asserted;

    b. Borrower shall either pay under protest or deposit with Lender the full amount (herein called "Lien Amount") of such Contested Lien, together with such amount as Lender may reasonably estimate as interest or penalties which might arise during the period of contest; provided that in lieu of such payment Borrower may furnish to Lender a bond or title indemnity in such amount and form, and issued by a bond or title insuring company, as may be satisfactory to Lender;

    c. Borrower shall diligently prosecute the contest of any Contested Lien by appropriate legal proceedings having the effect of staying the foreclosure or forfeiture of the Premises, and shall permit Lender to be represented in any such contest and shall pay all expenses incurred, in so doing, including fees and expenses of Lender's counsel (all of which shall constitute so much additional Indebtedness bearing interest at the Default Rate until paid, and payable upon demand);

    d. Borrower shall pay such Contested Lien and all Lien Amounts together with interest and penalties thereon (i) if and to the extent that any such Contested Lien shall be determined adverse to Borrower, or (ii) forthwith upon demand by Lender if, in the opinion of Lender, and notwithstanding any such contest, the Premises shall be in jeopardy or in danger of being forfeited or foreclosed; provided that if Borrower shall fail so to do, Lender may, but shall not be required to, pay all such Contested Liens and Lien Amounts and interest and penalties thereon and such other sums as may be necessary in the judgment of the Lender to obtain the release and discharge of such liens; and any amount expended by Lender in so doing shall be so much additional Indebtedness bearing interest at the Default Rate until paid, and payable upon demand; and provided further that Lender may in such case use and apply monies deposited as provided in subsection (b) above and may demand payment upon any bond or title indemnity furnished as aforesaid.

29. **Expenses Relating to Note and Mortgage**.

    a. Borrower will pay all expenses, charges, costs and fees relating to the Loan or necessitated by the terms of the Note, this Mortgage or any of the other Loan Documents, including without limitation, Lender's reasonable attorneys' fees in connection with the negotiation, documentation, administration, servicing and

enforcement of the Note, this Mortgage and the other Loan Documents, all filing, registration and recording fees, all other expenses incident to the execution and acknowledgment of this Mortgage and all federal, state, county and municipal taxes, and other taxes (provided Borrower shall not be required to pay any income or franchise taxes of Lender), duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Note and this Mortgage. Borrower recognizes that, during the term of this Mortgage, Lender:

i. May be involved in court or administrative proceedings, including, without restricting the foregoing, foreclosure, probate, bankruptcy, creditors' arrangements, insolvency, housing authority and pollution control proceedings of any kind, to which Lender shall be a party by reason of the Loan Documents or in which the Loan Documents or the Premises are involved directly or indirectly;

ii. May make preparations following the occurrence of an Event of Default hereunder for the commencement of any suit for the foreclosure hereof, which may or may not be actually commenced;

iii. May make preparations following the occurrence of an Event of Default hereunder for, and do work in connection with, Lender's taking possession of and managing the Premises, which event may or may not actually occur;

iv. May make preparations for and commence other private or public actions to remedy an Event of Default hereunder, which other actions may or may not be actually commenced;

v. May enter into negotiations with Borrower or any of its agents, employees or attorneys in connection with the existence or curing of any Event of Default hereunder, the sale of the Premises, the assumption of liability for any of the Indebtedness or the transfer of the Premises in lieu of foreclosure; or

vi. May enter into negotiations with Borrower or any of its agents, employees or attorneys pertaining to Lender's approval of actions taken or proposed to be taken by Borrower which approval is required by the terms of this Mortgage.

b. All expenses, charges, costs and fees described in this Paragraph 29 shall be so much additional Indebtedness, shall bear interest from the date so incurred until paid at the Default Rate and shall be paid, together with said interest, by Borrower forthwith upon demand.

30. **Financial Statements**. Borrower represents and warrants that the financial statements for Borrower and the Premises previously submitted to Lender are true, complete and correct in all material respects, disclose all actual and contingent liabilities of Borrower or

relating to the Premises and do not contain any untrue statement of a material fact or omit to state a fact material to such financial statements. No material adverse change has occurred in the financial condition of Borrower or the Premises from the dates of said financial statements until the date hereof. Borrower shall furnish to Lender such financial information regarding Borrower, its constituent partners or members, as the case may be, the Premises and any guarantor of the Note as Lender may from time to time reasonably request, which shall include, without any further request therefor, (i) annual financial statements for the Premises including a balance sheet, statement of income and rent roll for the Premises (if applicable), no later than thirty (30) days after the end of each calendar year, all in form, scope and detail satisfactory to Lender and certified by the chief financial officer or other appropriate officer, partner or member of Borrower, and (ii) annual audited financial statements for Borrower and the Premises and annual financial statements for any guarantor of the Note certified by such guarantor to be true, correct and complete, in each case, no later than ninety (90) days after the end of each year, together with an unqualified accountant's opinion in a form satisfactory to Lender and an operating budget for the Premises for the next year.

31. **Statement of Indebtedness**. Borrower, within seven days after being so requested by Lender, shall furnish a duly acknowledged written statement setting forth the amount of the debt secured by this Mortgage, the date to which interest has been paid and stating either that no offsets or defenses exist against such debt or, if such offsets or defenses are alleged to exist, the nature thereof.

32. **Further Instruments**. Upon request of Lender, Borrower shall execute, acknowledge and deliver all such additional instruments and further assurances of title and shall do or cause to be done all such further acts and things as may reasonably be necessary fully to effectuate the intent of this Mortgage and of the other Loan Documents.

33. **Additional Indebtedness Secured**. All persons and entities with any interest in the Premises or about to acquire any such interest should be aware that this Mortgage secures more than the stated principal amount of the Note and interest thereon; this Mortgage secures any and all other amounts which may become due under the Note or any other document or instrument evidencing, securing or otherwise affecting the Indebtedness, including, without limitation, any and all amounts expended by Lender to operate, manage or maintain the Premises or to otherwise protect the Premises or the lien of this Mortgage.

34. **Indemnity**. Borrower hereby covenants and agrees that no liability shall be asserted or enforced against Lender in the exercise of the rights and powers granted to Lender in this Mortgage, and Borrower hereby expressly waives and releases any such liability. Borrower shall indemnify and save Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses (including reasonable attorneys' fees and court costs) (collectively, "Claims") of whatever kind or nature which may be imposed on, incurred by or asserted against Lender at any time by any third party which relate to or arise from:   (a) any suit or proceeding (including probate and bankruptcy proceedings), or the threat thereof, in or to which Lender may or does become

26